FARMERS STATE BANK OF HARRIS, Appellee, v. LAURA HINTZ et al., Appellants.

OCTOBER 23, 1928.

912

*Diamond & Jory, Dwinell & Meltzer,* and *Havner, Flick & Powers,* for appellants.

*W. C. Garberson* and *Fisher & Riter,* for appellee.

EVANS, J.—On and prior to May 28, 1924, the defendant Hintz was the owner of farm real estate amounting to an acreage of 437 acres. Two sets of buildings were erected upon this real estate. Though it was all in one body, it was constituted as two farms, and was referred to in the record both in the singular and in the plural. 160 acres were appurtenant to one set of buildings, and 277 acres were appurtenant to the other, the latter being a fractional half section. The first of these farms was incumbered by a first mortgage for $16,000, and the second by a first mortgage for $25,500. Hintz had become insolvent, and several judgments had been entered against him, which became successive liens upon all the real estate. Execution sale had been had under one of these judgments on June 16, 1923. Thereafter, the plaintiff obtained a judgment, which became a lien upon the same land, subject to many prior liens. In due time, the plaintiff redeemed from the execution sale and from certain tax sales, and from all liens prior to its own, except from the first mortgages. The amount invested by plaintiff in such redemption was more than $26,000, exclusive of tax redemption. More than $5,500 was expended in tax redemption. These sums added to the two first mortgages, and accrued interest thereon, amounted to more than $75,000.

About March 1st, Hintz listed his real estate for sale with Fred Smith, of Minnesota, at $225 per acre, and Smith sought a purchaser therefor. It is claimed that, on May 28, 1924, Smith had procured Peter and Charles Sandekamp (father and son),

resident in Minnesota, as such purchasers, who were ready, able, and willing to buy at the stated price. It is claimed that the alleged slander was uttered on said May 28, 1924, by Woodworth, the cashier of the plaintiff-bank, to Smith, the agent of the defendant. Smith testified thereto as follows:

"Met Walter Woodworth, cashier, and asked him if he had seen Hintz. He said 'No,' he had not seen him for a day or two, and thought possibly he might be out of town. I told Woodworth, who is cashier of the plaintiff bank, that I had a buyer for the land. I asked him if Hintz did business with him, and he said he did, and I told him I wanted to draw up a contract for the sale of this land, and Woodworth said: 'Mr. Hintz doesn't own that farm; he has no equity or any interest in the farm; that the bank has taken it over, and that I am now negotiating and fixing up new loans on the farm,' and he said, 'You can tell your buyers so.'"

He also testified that he thereupon told Peter Sandekamp what Woodworth had said. No further negotiations were had with the Sandekamps.

It was, of course, incumbent upon the defendant to plead and prove special damages as an element of his case. He pleaded that, as a result of the repetition of the alleged slander to Sandekamp, he lost a sale, in that the Sandekamps would have purchased the farm at the named price, if they had not been misled by such slander, and that they were able, ready, and willing to buy the same. It is not claimed that the Sandekamps had entered into any binding contract for the purchase. The contention is that they would have done so. Hintz, himself, was not present in any conference between the Sandekamps and Smith; nor did he see Smith at any time after the listing until the 19th day of June, three days after the expiration of the year of redemption.

Many interesting legal questions pertaining to the law of slander are presented, and are ably discussed in the briefs. Because of the conclusion we reach upon other features in the case, we shall have no occasion to consider these.

I. The defendant was dependent upon testimony of the Sandekamps to prove that they were willing to buy at the price named. Smith's negotiations were had with Peter Sandekamp

 alone. He purported to testify, as a witness, as to what he would have been willing to do. His testimony was, in substance, that he would have been willing to buy on certain conditions only, and that Smith had promised that such conditions would be complied with. One of these conditions was that "they" would procure a first mortgage loan of $125 per acre. He testified that he would not have contracted to buy unless such loan were obtained. No legitimate evidence was introduced that such a loan could have been procured. To meet this point, appellant in his argument cites us to the testimony of the witness Fox. Fox was the receiver of the Harris Savings Bank. Hintz was indebted to such bank, and Fox had attempted to make collection. He testified as follows:

"I had the land examined by a loan company agent, the Lougee Company. They have their head office in Council Bluffs, and a branch office in Sioux City. The business of this company is making farm loans, and that was their business in 1924. They have a lot of loans around here. The name of the agent who examined the land was Eidsmoe; he was their examiner, the man who looks the farms over and advises about making the loan. I expect he then makes a report to the company. Have had experience in making farm loans in this part of the country, and had some such experience in 1924. Eidsmoe actually examined this farm, and told me *what loan his company would make on it.* I then went to Mr. Garberson, one of counsel for plaintiff, with this information, and I believe that he was then acting as attorney for the plaintiff bank. I discussed that matter with Mr. Garberson a little, told him that Hintz had asked me to try to procure a loan for him on that property; that the property had been examined by the agent of the loan company; and that he had agreed to place a loan on the land, and he said, 'I don't know much about it,—you take it back to the bank.' I told Mr. Garberson at that time that the company was willing to make a loan of $125 an acre. He referred me to the plaintiff bank. I then went to the bank with this information, and talked with Snyder, the assistant cashier, I believe. He was working in the bank. I told him I had come from Garberson's office, and that I could get a loan of $125 per acre on this land, and

he said that was not enough money. This talk was the latter part of February or the first of March, 1924.''

The foregoing is the sole evidence relied on by appellant at this point. It was received on the issue of malice. If the witness had testified that Eidsmoe had told him that Lougee would make a loan of $125 an acre, even so it would have been mere hearsay, and would have been incompetent to prove the fact. But the testimony of the witness is even more remote than this. He testified only that he (the witness) had told Garberson (the attorney) and Snyder (the assistant cashier) ''that the company was willing to make a loan of $125 an acre.'' This testimony is relied on by appellant as proof that he could have obtained a first mortgage loan for such amount. Such contention is wholly untenable.

II. There are features of the testimony of the Sandekamps, as witnesses, which reduce their testimony to the merest conjecture, and leave the defendant without any legitimate proof  that they were able or ready to buy the property upon the terms proposed, however willing they might have been to do so. We consider first the testimony of Peter. He was confronted, on cross-examination, with a previous affidavit made by him, and also by his assessment roll and his verification thereof. The substance of his cross-examination at this point was to reaffirm both of the documents presented to him. The terms of sale proposed to him by Smith was that $30,000 must be paid in cash before June 16, 1924. He testified on his direct examination that he had, on May 28, 1924, more than 100 head of cattle and more than 100 head of hogs ready for the market; that the cattle were worth $9,600, and the hogs worth $2,400; that he had feed to sell, worth $6,000; that he had $4,000 of money on hand, and a $2,000 second mortgage. On cross-examination, he was shown his assessment roll, verified by himself on May 26, 1924. The following is such assessment roll, purporting, pursuant to Minnesota law, to list all property owned by him on May 1, 1924.

''Household goods | $574.00
3 horses between 1 and 2 yrs. old | 105.00
5 horses between 3 and 16 yrs. old | 400.00

| | |
|---|---:|
| 3 horses over 16 years old | 30.00 |
| 17 grade cattle between 1 and 2 yrs. old | 306.00 |
| 5 grade cattle between 2 and 3 yrs. old | 125.00 |
| 13 grade cows | 455.00 |
| 1 bull | 50.00 |
| 70 hogs under 3 months old | 150.00 |
| 37 hogs over 3 months old | 444.00 |
| 9 head of poultry | 6.00 |
| 4 wagons | 105.00 |
| 4 sets of harness | 80.00'' |

The foregoing included also a listing of moneys at $37. The same witness testified that $5,000 of such sum was to be obtained from Charles Sandekamp. Charles Sandekamp testified that he had $2,500 in money, and that he had personal property worth upwards of $4,000, all of which was incumbered by a chattel mortgage for $1,700. It appeared further that, within a few weeks prior to such date, he had been discharged in bankruptcy. In March, 1924, he had become a renter on a farm, and the personal property owned by him consisted of the cattle, horses, and farm implements suitable for the farm. The testimony wholly fails to show that either one, or both, of these customers were, on May 28, 1924, or at any date subsequent thereto, in a position where they were *ready* to command $30,000 in cash. Their only claim was that, upon the property owned by them, they could borrow the money from someone not designated. The principal other property listed by Peter was his two-thirds interest in a farm of approximately 300 acres in Minnesota. This was incumbered by mortgages to the amount of $32,500. He testified that it was worth $150 an acre. On this valuation, there would be an equity in such farm of $12,500, of which the witness would own two thirds. Upon this equity, he proposed to borrow from some unknown source money for the purpose of buying the farm of the defendant. The assumption of these witnesses that they could borrow sufficient money upon their equities to meet the deficiency of the cash payment required was the merest conjecture, and in no legal sense could it be deemed proof of the fact. Nor was proof offered in any other form.

We are constrained to hold that the testimony of these witnesses of itself disclosed that they were not able or ready to buy this farm upon the terms proposed. A verdict to the contrary

could not properly be allowed to stand. In view of these features of the case, nothing would be gained by our consideration of other questions.

For these reasons, the order of the district court dismissing the counterclaim is—*Affirmed.*

STEVENS, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.