PITTMAN, Judge.
Angie E. Stewart appealed to the Supreme Court of Alabama from a judgment of the Baldwin Circuit Court that awarded Richard F. Williams $59,500 in damages for Stewart’s slander of title to property owned by Williams. The supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975. We reverse.
On September 25, 2008, Williams filed a complaint alleging that Stewart had slandered the title to rental property he owned in Robertsdale and had interfered with the contractual or business relations between him and his tenant, Troy Anders. Williams asserted that he and Anders had executed a written contract on March 3, 2008, pursuant to which Anders had agreed to renovate the house that Anders was leasing from Williams and to purchase the house from Williams for $125,000, with Anders paying Williams $100,000 at the closing of the sale on July 14, 2008, and Williams financing the balance of $25,000 at 10% interest. Williams further asserted that Stewart had agreed to help Anders with the renovation project by allowing Anders to charge materials for the project on her Lowe’s and Home Depot store credit cards and to pay Stewart back over time. Finally, Williams alleged that, on July 11, 2008 (three days before the alleged closing), Stewart had filed in the probate court of Baldwin County a lien in the amount of $50,000 against Williams’s property, thereby preventing, according to Williams, the sale of the property because the lender had refused to loan Anders the funds to purchase the house.
Stewart answered, generally denying the material allegations of the complaint, and counterclaimed, seeking to enforce the lien or to require Williams to pay her $50,000, the amount by which, Stewart said, Williams had been unjustly enriched. In addition, Stewart filed a third-party complaint against Anders, alleging that Anders had agreed to finance the purchase of the property in an amount sufficient not only to pay Williams but also to repay her for the materials that she had provided for the renovation project. On January 5, 2009, after Anders had failed to answer or otherwise defend Stewart’s third-party complaint, the trial court entered a default judgment against Anders and in favor of Stewart in the amount of $44,961.78.
In deposition testimony, Stewart stated that she and Williams had accompanied Anders to Lowe’s and Home Depot stores when the renovation materials had been purchased. She testified that Williams had been present when she had paid for the materials with her credit cards and that Williams had used his truck to haul the materials to the rental house. Stewart explained that her agreement with Anders required Anders to make the minimum monthly payments on her credit-card indebtedness for the renovation materials and to pay her the balance of the indebtedness, plus 25% interest as an interior-design fee, at or near the time of the closing. Stewart said that Anders had stopped communicating with her on May 24, 2008, and had failed to make any further monthly payments on her credit-card indebtedness.
When the case was called for a bench trial on September 26, 2011, the trial court stated that it was entering a default because neither Stewart nor her attorney had appeared and that Williams would present testimony, presumably as to damages. Soon thereafter, the court noted for the record that Stewart’s attorney had “just walked into the courtroom,” after *971 which the parties presented evidence as to the merits of the case.
At trial, Stewart acknowledged that she had never informed Williams that, if An-ders did not repay her, she would look to Williams for payment. She also acknowledged that she had filed the lien against Williams’s property in order to stop the closing on the sale of the property because, she said, she had received information indicating that Anders would not have sufficient funds at the closing both to purchase the house from Williams and to pay her what he owed her.
Williams presented the testimony of Robert McCorkindale II, a mortgage consultant who had worked with a lender to secure a loan for Anders. McCorkindale said he had ordered an appraisal of the renovated house. Edward Bufkin presented documentary evidence indicating that at the direction of Fidelity Mortgage Company (“Fidelity”) he had appraised the renovated house for $187,000 on August 7, 2008.
Williams testified that Anders had continued to remain in the house as a tenant until May 2010, 22 months after the date he claimed the parties had planned to close the sale of the house. Although Williams referred throughout the trial to the “closing date” of July 14, 2008, he presented no evidence indicating (a) that Fidelity or any other lender had actually agreed to loan funds to Anders, (b) that a closing date had ever been scheduled, or (c) that the existence of the lien had caused a lender not to make a loan to Anders. At the time of trial, neither party had been able to locate Anders and his whereabouts were unknown. Williams testified that, before Anders had left the rental house, Anders had removed many of the improvements he had made to the house, including appliances, interior doors, flooring, light fixtures, and a bathtub. Williams acknowledged that he had not investigated Anders’s credit history before he had agreed to sell the house to Anders. Stewart presented evidence indicating that judgment liens totaling nearly $54,000 had been filed against Anders in the probate court of Baldwin County in 2004 and 2005.
During the parties’ closing arguments at trial, the following occurred:
“THE COURT: Okay. All right, Mr. Shepherd [counsel for Williams], what evidence is there that this closing would have taken place but for the lien?
“MR. SHEPHERD: Your Honor, the judgments don’t stop Mr. Anders, if that is the same Mr. Anders. One can buy property with the judgment, it’s the selling of the property—
“THE COURT: He can buy it, but /all haven’t proved that he would have gotten a mortgage loan.
“MR. SHEPHERD: Judge, with Fidelity—
“THE COURT: With what?
“MR. SHEPHERD: With Fidelity. Fidelity — Judge, what we have shown is that Fidelity sent an appraiser out there to get an appraisal for this property.
“THE COURT: Right. And, Fidelity would have had a title check run and they would have seen the statement of lien, and I agree, that would stop the closing. I mean, there are two separate questions. One is, would [Anders] have qualified for a mortgage loan. And, I mean, there is no evidence that there was a commitment from any mortgage company other than that an appraisal company was hired.
“MR. SHEPHERD: That’s correct. We have an appraised value and we have a contract showing what the purchase amount was to be. We could not locate — so I couldn’t produce a closing agent.
*972 “THE COURT: All right. I suspect because there wasn’t one.
“MR. SHEPHERD: Well, it didn’t happen. That’s true, there wasn’t.
“THE COURT: I mean, a mortgage package was never sent to any closing agent or at least there is no evidence that one was.
“Well, what is clear from the evidence is that [Anders] took advantage of two people to their detriment. And the Court will take the case under submission and enter a judgment as soon as I can.”
On October 13, 2011, the trial court rendered and entered the following judgment:
“1. The Court finds from the evidence that [Stewart] willfully and maliciously filed a statement of lien on the property of [Williams] at a time when she knew that he had entered into a contract to sell the property to Anders. The Court also finds from the evidence that [Stewart] knew that she had no legal basis for filing the statement of lien. Moreover, she never filed suit within six months to enforce the lien.
“2. The Court finds from the evidence that because of the filing of the statement of lien the sale of the house did not close.
“3. An examination of the statutory warranty deed from Regions Bank to [Williams] discloses that deed tax was paid in the amount of $65.50. The Court deems that to represent a purchase price of $65,000.00 for the property in April of 2004 while the house was in an uncompleted state. The contract of sale between [Williams] and Troy Anders was for $125,000.00; therefore, the special damages suffered by [Williams] as a proximate result of [Stewart’s] wrongful conduct is $59,500.00. The Court enters judgment in favor of [Williams] and against [Stewart] in the sum of $59,500.00 plus the cost of court.
“4. The Court denies [Williams’s] request for punitive damages.”
On appeal, Stewart contends that she had a lawful right to file the lien; that her filing the lien was not malicious; and that Williams failed to prove that the filing of the lien was the legal cause of the loss Williams claimed.[1]
Our review of the trial court’s judgment is governed by the following principles:
‘When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error. Griggs v. Driftwood Landing, Inc., 620 So.2d 582 (Ala.1993); First National Bank of Mobile v. Duckworth, 502 So.2d 709 (Ala.1987). However, where the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the court’s judgment carries no presumption of correctness. Beavers v. County of Walker, 645 So.2d 1365 (Ala.1994). Because no material facts are disputed and this appeal focuses on the application of the law to *973 the facts, no presumption of correctness] is accorded to the trial court’s judgment. Therefore, we review de novo the application of the law to the facts of this case. Beavers, supra; Lake Forest Property Owners’Ass’n v. Smith, 571 So.2d 1047 (Ala.1990).”
Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996).
Section 6-5-211, Ala.Code 1975, provides: “The owner of any estate in lands may commence an action for libelous or slanderous words falsely and maliciously impugning his title.”
“The elements constituting a slander of title as a basis for the recovery of damages are as follows: (1) Ownership of the property by plaintiff; (2) falsity of the words published; (3) malice of defendant in publishing the false statements; (4) publication to some person other than the owner; (5) the publication must be in disparagement of plaintiffs property or the title thereof; and (6) that special damages were the proximate result of such publication (setting them out in detail). The amount of loss in each of the particulars of special damages claimed need not be stated.”
Womack v. McDonald, 219 Ala. 75, 76-77, 121 So. 57, 59 (1929) (emphasis added; citations omitted).
The trial court’s finding that “because of the filing of the statement of lien the sale of the house did not close” is unsupported by the evidence and is plainly and palpably erroneous. As previously discussed, Williams failed to show that any lender had made a loan commitment to Anders, that a closing on the sale of the property had ever been scheduled, or that the existence of the lien was a factor that had caused a lender not to make a loan to Anders. Consequently, Williams did not prove that Stewart’s alleged slander of title was the legal cause of the loss he suffered. Comments b. and c. to Section 632 of the Restatement (Second) of Torts, which deals with the issue of legal causation in slander-of-title and trade-libel cases, state, in pertinent part:
“[T]he publication of an injurious falsehood must not only affect the person or property concerning which it is published, but it must also be a legal cause of pecuniary loss. This means that it must be a substantial factor in determining the conduct of third persons which brings about the loss.
[[Image here]]
“.... In order for the false statement to be a substantial factor in determining the conduct of an intending or potential purchaser or lessee, it is not necessary that the conduct should be determined exclusively or even predominantly by the publication of the statement. It is enough that the disparagement is a factor in determining his decision, even though he is influenced by other factors without which he would not decide to act as he does. Thus many considerations may combine to make an intending purchaser decide to break a contract or to withdraw or refrain from making an offer. If, however, the publication of the disparaging matter is one of the considerations that has substantial weight, the publication of the disparaging matter is a substantial factor in preventing the sale and thus bringing financial loss upon the owner of the thing in question.”
In Farmers’ State Bank of Harris v. Hintz, 206 Iowa 911, 221 N.W. 540 (1928), the trial court directed a verdict on the defendant’s slander-of-title counterclaim. The Supreme Court of Iowa affirmed, concluding that the evidence did not show either that the defendant could have obtained a first mortgage loan required by the prospective purchasers or that the prospective purchasers were ready and able to buy the property on the terms pro *974 posed. In Ross v. Jarrett, 146 S.W.2d 219, 221 (Tex.Civ.App.1940), a Texas jury rendered a verdict in favor of plaintiffs who alleged “that they had made a tentative sale of an oil lease on the properties to one McCullough, which sale was lost because of the cloud cast upon their titles by the defendants.” The Texas appellate court reversed, holding that the plaintiffs had not established damages because the evidence indicated that “McCullough was willing to buy the lease but was unable to pay for it.” Id. In Gardner v. West-Col, Inc., 136 Vt. 381, 392 A.2d 383 (1978), the trial court dismissed as unsupported by the evidence a seller’s slander-of-title counterclaim against a buyer. The Supreme Court of Vermont affirmed, stating the following:
“An essential element of the cause of action for slander of title is special damages. W. Prosser, The Law of Torts § 128, at 920 (4th ed.1971). These damages must be proved by the injured party as a prerequisite to recovery. Id. § 128, at 922. At minimum, the injured party must demonstrate that any damages result from the ‘slander’ and not from other factors. See Id. § 128, at 923-24.... No evidence was presented to tie any damages to the alleged ‘slander.’ ”
136 Vt. at 387, 392 A.2d at 386-87 (emphasis added).
Because Williams failed to prove the causation element of his slander-of-title claim, the trial court’s judgment is reversed, and the cause is remanded for entry of a judgment in favor of Stewart.
REVERSED AND REMANDED.
THOMPSON, P.J., and THOMAS, MOORE, and DONALDSON, JJ., concur.

. Stewart does not argue that Williams cannot prevail on his slander-of-title claim based on the principle stated in Dent v. Batch, 213 Ala. 311, 104 So. 651 (1925):
"The law is well settled that if there is in existence, before the perpetration of the alleged slander of title, a valid and enforceable contract for the sale of the land in question, no recovery can be had against the slanderer for the damage resulting from the executory purchaser’s breach of his contract to purchase.
"In such a case the law presumes that the vendor can recover any resulting loss from the defaulting purchaser, and he is left to that remedy.”
213 Ala. at 312, 104 So. at 652 (citations omitted).